UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ANDREW DIXON (#514514)                              CIVIL ACTION

VERSUS

WARDEN BURL CAIN, ET AL.                       NO. 14-0451-JJB-RLB

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on September 2, 2015.

                                               **RICHARD L. BOURGEOIS, JR.**
                                               **UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ANDREW DIXON (#514514)** | **CIVIL ACTION** |
| **VERSUS** | |
| **WARDEN BURL CAIN, ET AL.** | **NO. 14-0451-JJB-RLB** |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (R. Docs. 11 and 15).[1]

The *pro se* plaintiff, an inmate incarcerated at the Louisiana State Penitentiary ("LSP"), Angola, Louisiana, filed this action pursuant to 42 U.S.C. § 1983 against Warden Burl Cain and Secretary James LeBlanc, complaining that his constitutional rights to due process and equal protection have been violated by the defendants' interference with his right to marry his "fiancée," Ms. Nancy McCall, a former employee at LSP.

The plaintiff moves for summary judgment, relying upon the pleadings, a copy of a memorandum dated May 22, 2013, denying the plaintiff's request to add Nancy McCall to his Offender Visiting List, a copy of an administrative grievance prepared by the plaintiff dated February 17, 2014, copies of the First and Second Step Responses to the plaintiff's grievance, dated April 1 and May 20, 2014, respectively, a copy of an excerpt from the January/February,

---

1. Pursuant to Order dated July 28, 2015 (R. Doc. 24), the Court converted the defendants' motion to dismiss, brought pursuant to Fed. R. Civ. P. 12(b)(6), to a motion for summary judgment brought pursuant to Fed. R. Civ. P. 56. The defendants have since filed a supplemental memorandum in support of their pending motion (R. Doc. 26), together with additional supporting documentation, and the plaintiff has filed a supplemental memorandum in opposition to the defendants' motion (R. Doc. 31).

2011, issue of The Angolite Magazine, a copy of excerpts from Department Regulation No. C-02-008 (re: Offender Visitation), and a copy of LSP Directive No. 24.001 (re: Inmate Marriage Requests).

The defendants move for summary judgment, relying upon the pleadings, a Statement of Undisputed Facts, a certified copy of Department Regulation B-08-005 (re: Faith-Based Programs and Services, including Marriages), a certified copy of Department Regulation B-08-007 (re: Offender Marriage Requests), a certified copy of Department Regulation C-02-008 (re: Offender Visitation), a certified copy of LSP Directive No. 24.001 (re: Offender Marriage Requests), a certified copy of Offender Posted Policy # 030 (re: Visitation), a certified copy of the plaintiff's visitation records, a certified copy of the Personnel File of former LSP employee Nancy McCall (under seal), a certified copy of an Investigation Report dated January 3, 2011, prepared by then-Major Stewart Hawkins, a certified copy of the plaintiff's pertinent administrative remedy proceedings, a copy of the plaintiff's file with the LSP Chaplain's Department, and the affidavits of Dpty Warden Richard Peabody, Chaplain's Department employee Bernadine St. Cyr, ARDC Specialist Donald Cavalier, Col. Stewart Hawkins, Capt. Kristen (Strahan) Hooper, Ass't Warden Kevin Benjamin, and defendant Warden Nathan Burl Cain.

Pursuant to well-established legal principles, summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A party moving for summary judgment must inform the Court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file,

together with affidavits, if any, that show that there is no such genuine issue of material fact. *Celotex Corp. v. Catrett*, *supra*, 477 U.S. at 323. If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 248. This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, *supra*, 477 U.S. at 323. Summary judgment is appropriate in any case where the evidence is so weak or tenuous on essential facts that the evidence could not support a judgment in favor of the non-moving party. *Little v. Liquid Air Corp.*, *supra*, 37 F.3d at 1075. In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

In his Complaint, the plaintiff alleges that in 2010, while assigned to a job in the prison hospital as a health care orderly, he became friendly with an LSP employee, Nancy McCall, who worked as a nurse at the facility. Because of a concern regarding potential improprieties and rule violations, Nurse McCall was questioned about her relationship with the plaintiff, after which she resigned "on the spot," allegedly because she believed that the questioning was "out of line and disrespectful." Notwithstanding, according to the plaintiff, he and Ms. McCall continued to

communicate and, in 2011, they allegedly decided to marry.  The plaintiff alleges that he conducted research into the prison marriage policies and learned that, in order for inmates to be approved to marry at LSP, the inmate's proposed spouse must be on the inmate's Offender Visiting List for at least six (6) months prior to applying for approval.  Accordingly, in May, 2011, the plaintiff made a formal request to add Ms. McCall, who the plaintiff identified as his "fiancée," to his Visiting List.  The plaintiff's request was denied, however, with the reason given for the denial being that Ms. McCall was a former employee of the prison.  According to the plaintiff, he thereafter made numerous additional requests to add Ms. McCall to his Visiting List – in June and November, 2011, October, 2012, and May and October, 2013 – but these requests were also denied.  In addition, the plaintiff alleges that he and Ms. McCall began writing letters and making telephone calls to Warden Cain's office, expressing their desire to marry and requesting that Ms. McCall be added to the plaintiff's Visiting List so that they could "meet the requirements of the marriage policy."  Finally, in February, 2014, the plaintiff submitted an administrative grievance to prison officials, asserting that he had a constitutional right to marry and that the LSP marriage policy interfered with that fundamental right without furthering a legitimate penological interest.  On May 20, 2014, the plaintiff's grievance was denied at the Second Step of the administrative process, with the Second Step denial being issued by the office of Secretary LeBlanc.  The plaintiff contends that the defendants' conduct has effectively violated his constitutional right to marry.  The plaintiff also contends that the defendants have violated his constitutional right to equal protection because he asserts that other inmates have been allowed to add former employees to their Visiting Lists and/or have been allowed to marry  former employees.

In responding to the plaintiff's allegations, the defendants first seek dismissal, on jurisdictional grounds, of the plaintiff's claim asserted against them in their official capacities for monetary damages. In this regard, the defendants are correct that § 1983 does not provide a federal forum for a litigant who seeks monetary damages against either a state or its officials acting in their official capacities, specifically because these officials are not seen to be "persons" within the meaning of § 1983. *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989). In addition, in *Hafer v. Melo*, 502 U.S. 21 (1991), the United States Supreme Court addressed the distinction between official capacity and individual capacity lawsuits and made clear that a suit against a state official in an official capacity for monetary damages is treated as a suit against the state and is therefore barred by the Eleventh Amendment. *Id.* at 25. Accordingly, the plaintiff's claim asserted against the defendants in their official capacities for monetary damages is subject to dismissal. In contrast, the plaintiff's claim for monetary damages asserted against the defendants in their individual capacities remains theoretically viable because a claim against a state official in an individual capacity, seeking to impose personal liability for actions taken under color of state law, is not treated as a suit against the state. *Id.* at 29.[2]

In addition to the foregoing, although not addressed by the defendants, the Court notes that, in any event, the plaintiff is not entitled to recover compensatory damages from the defendants in this case. Specifically, pursuant to 42 U.S.C. § 1997e(e), "[n]o Federal civil action

---

2. The plaintiff's Complaint also includes a request for prospective injunctive relief, and such a claim, even if asserted against a state official in an official capacity, is allowed to proceed and is not prohibited under the Eleventh Amendment because such a claim is not seen to be a claim against the state. *See Will v. Michigan Department of State Police, supra*, 491 U.S. at 71 n. 10; 15 *Am. Jur. 2d Civil Rights* § 101. Thus, there is no jurisdictional bar to the plaintiff's claim for equitable relief asserted against the defendants.

may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury." The plaintiff does not suggest in his Complaint that he has suffered a physical injury as a result of the events alleged. Accordingly, he is precluded from the recovery of compensatory damages herein. Whereas he might still be able to recover punitive damages, *Hutchins v. McDaniels*, 512 F.3d 193, 198 (5th Cir. 2007), he would be required to make a showing that the defendants violated his constitutional rights with "evil intent" or "callous indifference." *See Allen v. Stalder*, 201 Fed. Appx. 276 (5th Cir. 2006), *citing Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir. 2003).

Turning to a substantive review of the plaintiff's claims, his principal claim is that the defendants have impermissibly impinged upon his constitutional right to marry. This claim, however, appears to be premature because there is no evidence in the record that the plaintiff and Ms. McCall have in fact formally requested authorization from prison officials to marry and that prison officials have refused that request. In addition, notwithstanding the plaintiff's assertion that he wants to marry Ms. McCall, there is no independent evidence in the record suggesting that Ms. McCall is equally willing to marry the plaintiff. For example, although the plaintiff asserts that, beginning in 2011, he and Ms. McCall have addressed numerous letters to Warden Cain, "asking permission to meet the requirements of the marriage policy," the record contains no copies of correspondence authored by Ms. McCall that express this desire. And as for the two items of correspondence contained in the record that were apparently authored by the plaintiff and addressed to prison officials, dated October 24, 2012, and April 11, 2013, respectively, *see* R. Doc. 26-14 at pp. 11 and 14, these items of correspondence refer only to the plaintiff's desire to add Ms. McCall to his Visiting List and include no request for permission to marry and, in fact, make no reference to marriage whatever. Finally, whereas the plaintiff has

referred to Ms. McCall as his "fiancée" in the multiple forms he has submitted requesting to add her to his Visiting List, *see* R. Doc. 26-14 at pp. 8, 13, 23, 25, 27, 31 and 35, the subsequent questionnaires that were sent to and returned by Ms. McCall reflect her identification of the plaintiff only as a "friend." *See id.* at pp. 20, 29 and 33. Thus, the record is far from clear that the plaintiff and Ms. McCall are in fact betrothed or are equally ready and willing to enter into a marriage relationship.

In addition to the foregoing, the Court notes that the administrative grievance that the plaintiff submitted to prison officials in February, 2014, similarly did not include a formal request for authorization to marry Ms. McCall but only referred, instead, to his prior attempts at having Ms. McCall added to his Visitor List "in hopes of meeting the requirements of the marriage policy." *See* R. Doc. 26-16 at pp. 3-5. The plaintiff also acknowledged in the referenced grievance that he was aware that, in order to obtain approval to marry, he and Ms. McCall were required to each "submit separate letters to the Chaplins [sic] Dept.," requesting authorization to marry, but the plaintiff made no assertion that either he or Ms. McCall had submitted such letters. In contrast, the defendants have submitted an affidavit attesting that the only letter submitted by the plaintiff to the LSP Chaplain's Department was dated March 1, 2015, almost a year after the filing of this lawsuit, and only sought information regarding the prison's marriage policies, not authorization to marry. *See* R. Doc. 26-2 at pp. 4-5. Specifically, the referenced letter stated only that the plaintiff and his purported fiancée were "*thinking* about getting married" and requested copies of the pertinent "requirements" and the "paperwork that [had] to be completed." *See* R. Doc. 26-17 at p. 2 (emphasis added).

An analogous factual situation was presented to a Mississippi district court in *Holmes v. Shelly*, 2014 WL 1451159 (N.D. Miss. April 14, 2014). In *Holmes*, the plaintiff inmate

complained that his request to marry a former correctional employee had been denied by prison officials and that the former employee was not permitted to visit him because of a prison policy that restricted visitation by former employees. In addressing the plaintiff's claims, the Court concluded that the plaintiff's marriage claim was premature because he had not shown that the former employee, his proposed spouse, was as willing to marry the plaintiff as the plaintiff was to marry her, specifically because the plaintiff's prayer for relief in that case was only for authorization to marry the former employee, "if she wants to marry me." In the instant case, similarly, there is no evidence in the record that allows the Court to conclude that Ms. McCall has accepted a proposal of marriage from the plaintiff or has in fact agreed to enter into a marriage relationship with him. As noted above, the only documents in the record that are attributable to Ms. McCall contain references to the plaintiff as being a "friend," not a fiancée. Thus, the plaintiff's claim appears to be premature and, in any event, neither he nor Ms. McCall has complied with prison rules by submitting separate formal marriage requests to the LSP Chaplain's Department. As a result, prison officials, including the named defendants, have not been afforded an opportunity to accept or reject any such request, nor have prison officials been afforded an opportunity to potentially exercise discretion and waive the 6-month visitor-list requirement so as to allow the plaintiff and Ms. McCall to marry. *See Post v. Mohr*, 2012 WL 76894, *10-11 (N.D. Ohio, Jan. 10, 2012) (rejecting an inmate's claim regarding interference with his right to marry where there was no showing that any named defendant had denied a formal request to marry and where the inmate had made no reference to marriage in his formal request to add his proposed spouse to his visitor's list). *See also Edge v. Ferrell*, 2008 WL 942038, *7 (S.D. Ala. April 7, 2008) (finding no violation of the right to marry where prison officials denied *informal* requests for marriage where there had been no compliance with prison

rules that required, *inter alia*, a request to marry by both the inmate and his "intended"). Accordingly, based upon the showing made, the Court finds that the plaintiff's marriage claim is premature and is therefore subject to dismissal, without prejudice.

Notwithstanding the foregoing, even were the Court to conclude that the plaintiff's marriage claim is properly before the Court, the Court would nonetheless find this claim to be without merit. Specifically, as discussed hereafter, the Court finds that neither the LSP visitation policy nor the LSP marriage policy result in an impermissible interference by prison officials with the plaintiff's constitutional right to marry.

First, with regard to the LSP visitation policy, the law is clear that convicted inmates have no absolute constitutional right to visitation. *Staggs v. Johnson*, 228 F.3d 409 (5th Cir. 2000). As a result, limitations upon the exercise of an inmate's visitation rights may be imposed "if they are necessary to meet legitimate penological objectives, such as rehabilitation and the maintenance of security and order." *Lynott v. Henderson*, 610 F.2d 340, 342-43 (5th Cir. 1980). *See also Toppins v. Day*, 73 Fed. Appx. 84, *3 (5th Cir. 2003). In evaluating whether specific limitations upon visitation are supportable, the courts look to see whether the prison's visitation policies further the penological objectives that are invoked to support them. *Lynott v. Henderson, supra. See also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (recognizing that courts may uphold visitation restrictions that "bear a rational relation to legitimate penological interests"); *Turner v. Safely*, 482 U.S. 78, 89 (1987) (providing a balancing test for determining the reasonableness of regulations that limit the rights of inmates). "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [security] considerations[,] courts should ordinarily defer to their expert judgment in such

matters." *Thorne v. Jones*, 765 F.2d 1270, 1275 (5th Cir. 1985), *quoting Block v. Rutherford*, 468 U.S. 576, 584-85 (1984).

In the instant case, the pertinent Department Regulation, No. C-02-008, provides, in pertinent part:

> 4) Visitation by Staff/Ex-Employees
>
> Visitation by employees of the Department is reserved for immediate family members only.... A departmental employee or an ex-employee may be denied approval to visit if such denial is deemed by the Warden or designee to be in the best interest of the institution.
>
> 5) Exceptions
>
> Exceptions to the provisions of this Section ... may be specifically authorized by the Warden or designee.

*See* R. Doc. 26-11 at p. 8. *See also* Offender Posted Policy # 30, R. Doc. 26-13 at p. 4. In support of these limitations, the defendants invoke the legitimate penological objectives of prison safety and security. Specifically, Warden Cain states in his affidavit that "[b]ecause of their knowledge of institutional policies and procedures, ex-employees are generally prohibited from being placed on an offender's visiting list for a period of (years). This is done to prevent the introduction of contraband which may jeopardize the safety and security of offenders and employees." *See* R. Doc. 26-2 at p. 2. *See also* the affidavit of ARDC Manager Donald Cavalier:

> It is common practice for offenders' requests to add ex-employees to their visitation lists to be denied. Ex-employees pose a security risk to the institution because they have knowledge of institutional policies and procedures. This knowledge may allow ex-employees to bring contraband through security checkpoints. Contraband may include money, drugs and weapons which pose a risk to other offenders and to any employee of the institution.

R. doc. 26-5. Warden Cain further asserts that he has reviewed the Investigation Report prepared in connection with the events surrounding the resignation of Ms. McCall from

employment with LSP in November, 2010, *see* R. Doc. 26-15, and that Investigation Report chronicles a finding that Ms. McCall violated prison rules by engaging in a nonprofessional relationship with members of the plaintiff's family, and also potentially with the plaintiff himself, including writing letters to him and bringing a movie DVD into the prison for him. Warden Cain attests that, based upon the circumstances outlined in that Report, it is his view that Ms. McCall independently "poses a risk to the safety and security of the institution." *See* R. Doc. 26-2 at p. 2.

Based upon the foregoing, the Court finds that the prison policy and the limitations placed upon the plaintiff's visitation are reasonable and supported by the security concerns invoked to support them. There are a number of reported decisions that have addressed restrictions upon visitation similar to those addressed herein, and this Court has found none that find such restrictions to be unreasonable or impermissible. *See, e.g.*, *Dewitt v. Wall*, 41 Fed. Appx. 481, 482 (1st Cir. 2002) (collecting cases). This is so even where the limitations upon visitation may have the effect of restricting an inmate's ability to marry or of preventing an inmate from visiting with a person to whom he is already married. *See id.* (upholding a policy that precluded visitation between the inmate plaintiff and his wife because she was a former employee); *Caraballo-Sandoval v. Honsted*, 35 F.3d 521, 525 (11th Cir. 1994) (upholding termination of visiting privileges between an inmate and his wife and opining that "concerns that former prison employees visiting inmates may pose a threat to security because of their knowledge of security procedures constitutes a legitimate penological objective"); *Fisher v. Warner*, 2015 WL 1282143, *6 (W.D. Wash. March 20, 2015) (upholding a policy limiting visitation by fiancée that had the effect, as in the instant case, of limiting the prisoner's ability to marry his fiancée because of a visitor-list requirement for marriage); *Riker v. Lemmon*, 2014 WL

3740440, *8 (S.D. Ind. July 30, 2014) (upholding a decision to disallow visitation between an inmate and a former employee, notwithstanding the inmate's interest in marrying her, noting that, "[a]llowing ... former employees[] to visit inmates is a legitimate security risk and the Court will not second guess the security concerns expressed by the correctional authorities"); *Deeds v. Helling*, 2009 WL 803130, *9 (D. Nev. Feb. 19, 2009) (upholding a policy that denied visiting privileges between the inmate plaintiff and his wife, who was a former prison employee, because "defendants' policy disallowing visits between inmates and former employees meets the *Turner [v. Safely]* test and is reasonably related to a legitimate penological interest"). *Cf., Staggs v. Johnson, supra* (upholding a determination by prison officials that the inmate plaintiff was precluded from visiting with his wife, a former prison employee, based on the "prison's policy that former employees may not visit inmates"). Accordingly, the Court finds that the plaintiff has failed to present an arguable basis in fact or in law for his claim regarding the visitation policy at LSP, and this claim should be dismissed.

The Court also finds supportable the provision in the LSP marriage policy that "[n]o request for marriage will be considered by the Warden unless the offender's fiancé has been on the offender's visiting list for a period of at least six (6) months." *See* LSP Directive No. 24.001, R. Doc. 26-12. In this regard, the United States Supreme Court has recognized that the right to marry is part of the fundamental "right of privacy" implicit in the Fourteenth Amendment's due process clause. *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978). Thus, individuals are generally entitled to make decisions regarding marriage without unjustified government interference. *Id.* at 385. However, not all regulations affecting the right to marry are subject to rigorous scrutiny, and "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Id.* at 385-86. These same principles apply

to incarcerated inmates in the prison context as well, although it is recognized that "[t]he right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration." *See Turner v. Safley, supra*, 482 U.S. at 95-96.

The requirement that an inmate's fiancée be on his Visiting List for a period of at least six months before he seeks approval to marriage is not a significant interference with an inmate's right to marry. Through its normal operation, the referenced regulation, by its terms, will generally do no more than delay an inmate's ability to get married for that length of time, because the stated policy of the prison is that, upon compliance with the regulation, marriage requests "will be considered ... and approved absent circumstances related to legitimate penological objective[s]." *See* R. Doc. 26-12 at p. 2. In this context, actions taken by prison officials that have the effect of merely delaying an inmate's ability to marry are not objectionable for that reason alone. *See Martin v. Snyder*, 329 F.3d 919, 921-22 (7th Cir. 2003) (finding no constitutional violation where prison officials denied an inmate's marriage request because the inmate and his girlfriend had violated prison rules, but then authorized the marriage 12 months later). Further, the defendant warden in this case has provided an affidavit wherein he explains the penological justification for the 6-month visitation rule. *See* R. Doc. 26-2. Warden Cain attests therein that:

> I established Louisiana State Penitentiary Directive 24.001 to ensure to the safety and interests of the offenders at Louisiana State Penitentiary. In the past, there have been instances of individuals quickly marrying offenders and taking advantage of these inmates by, among things, depleting their offender bank accounts before ceasing communications with them. I established the six month visitation requirement to ensure that the offender had a meaningful and established relationship with the individual that they were seeking to marry. Additionally, the six month visitation requirement further fosters the idea that the marriage relationship is meaningful because it is a precedent to marriage that visitation be allowed between the parties. In some events, the security needs of the prison may prevent individuals from ever being able to physically interact with one another. Allowing offenders to marry individuals who are prohibited from

> visiting the premises would be at odds with Louisiana State Penitentiary's objective of providing for the physical, mental, and spiritual well-being of those incarcerated.

*Id.* The Court does not find fault with these penological justifications. Nor have other courts that have addressed similar restrictions. *See Fisher v. Warner*, 2015 WL 1282143, *6-7 (W.D. Wash. March 20, 2015) (undertaking the *Turner v. Safely* reasonableness analysis and upholding both a ban on visitation and a regulation that, because it required that a proposed spouse be on an inmate's visiting list, resulted in the inmate's inability to marry); *Riker v. Lemmon*, 2014 WL 3740440, *3 (S.D. Ind. July 30, 2014) (upholding a ban on visitation between an inmate and a former employee notwithstanding that the ban resulted in a denial of approval to marry the former employee "because [she] was not on [his] approved visitation list"). *See also Post v. Mohr*, 2012 WL 76894, *10-11 (N.D. Ohio Jan. 10, 2012) (analyzing a ban on visitation that the inmate plaintiff contended made it impossible for him to marry and noting that, "[a]lthough the denial of visitation privileges may make it more difficult for the marriage to occur, they are two separate inquiries," and no named defendant had denied a formal request for marriage). In the instant case, similarly, the Court does not find fault with the LSP regulation that provides, as a precondition for marriage, that an inmate's proposed spouse be on his Visitor List, particularly where, as here, no formal request for marriage has been submitted by either the plaintiff or his proposed spouse for the defendant warden to review and consider. Accordingly, the plaintiff's claim in this regard is subject to dismissal as being without merit.[3]

---

3. The defendants also assert that that they are entitled to qualified immunity in connection with the plaintiff's claims. The qualified immunity defense is a familiar one and, employing a two-step process, operates to protect public officials who are performing discretionary tasks. *Huff v. Crites*, 473 Fed. Appx. 398 (5th Cir. 2012). As enunciated in *Saucier v. Katz*, 533 U.S. 194 (2001), the first step in the analysis is to consider whether, taking the facts as alleged in the light most favorable to the plaintiff, the defendants' conduct violated the plaintiff's constitutional rights. *Id.* at 201. Second, the district court looks to whether the rights allegedly violated were clearly established at the time that the violation occurred. *Id.* This

The plaintiff also asserts in this case that his constitutional right to equal protection has been violated as a result of the defendants' actions. In this regard, the Equal Protection Clause of the Fourteenth Amendment requires essentially that all persons similarly situated be treated alike. *See Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996). In order to successfully plead an equal protection claim, an inmate plaintiff must allege and show that he is a member of a specific group and that prison officials have acted with a discriminatory purpose because of such membership. A discriminatory purpose "implies that the decision maker singled out a

---

inquiry, the Court stated, is undertaken in light of the specific context of the case, not as a broad, general proposition. *Id.* The relevant, dispositive inquiry in determining whether a constitutional right was clearly established is whether it would have been clear to a reasonable state official that his conduct was unlawful in the situation which he confronted. *Id.* at 202. The assertion of the qualified immunity defense alters the summary judgment burden of proof. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). Once a defendant pleads qualified immunity, the burden shifts to the plaintiff, who "must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Gates v. Texas Department of Protective and Regulatory Services*, 537 F.3d 404, 419 (5th Cir. 2008), *citing Michalik v. Hermann, supra*, 422 F.3d at 262.

      In the instant case, this Court has found no clearly established law that would have informed the defendants that their actions in the instant case would result in the violation of the plaintiff's constitutional rights. *See, e.g., Riker v. Lemmon, supra*, 2014 WL 3740440, *5 (concluding that prison officials were entitled to qualified immunity in connection with a visitation/right-to-marry claim); *Edge v. Ferrell, supra*, 2008 WL 942038, *5-6 (same). Accordingly, the Court concludes that the defendants are entitled to qualified immunity in connection with the plaintiff's claims. In addition, it does not appear that either of the defendants has taken personal and direct action that may have violated the plaintiff's constitutional rights in any event. *See Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983) (requiring a causal connection between the conduct of the defendants and the constitutional violation sought to be redressed). Specifically, the six-month visitation list requirement is contained in the LSP regulation on marriage, not in a rule or regulation attributable to the Department of Corrections. Accordingly, the Secretary of the Department, defendant LeBlanc, has not been shown to have been personally involved in the creation or implementation of that requirement. Further, as noted previously, Warden Cain has not been shown to have ever been presented with a formal or unambiguous request for approval to marry that defendant Cain has denied. The mere tangential involvement of the defendants, through the denial by their respective offices of the plaintiff's administrative grievance, is not sufficient to support a finding of personal involvement in the events alleged. *See Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005).

particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001), *quoting Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir. 1988). An inmate cannot base an equal protection claim solely on a personal belief that he has been a victim of discrimination. *Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir. 1995). Specifically, vague and conclusory allegations are insufficient to support an equal protection claim. *See Pedraza v. Meyer*, 919 F.2d 317, 318 n. 1 (5th Cir. 1990).

In the instant case, all that the plaintiff has provided are vague and conclusory allegations that other prisoners confined at LSP have been treated differently than he has. This unsupported assertion is not a sufficient foundation upon which to base a claim that prison officials have intentionally singled out the plaintiff, as a member of a particular group, for disparate treatment or that the plaintiff is even a member of such a group. Whereas the plaintiff has identified by name three inmates who he contends have been allowed to add former prison employees to their visitor lists, the plaintiff provides no information whatever regarding the situations faced by those inmates, *e.g.,* whether the former employees had familial relationships with the inmates, which is a recognized exception to the regulation, *see* R. Doc. 13-1 at p. 5, or whether the former employees' termination of employment, as here, took place in connection with suspected violations of prison rules. Further, the mere fact that prison officials may have exercised their discretion in favor of visitation for other inmates, as allowed by the prison regulation, *see id.,* does not give rise to a right to the same exercise of discretion in favor of the plaintiff, or lead to an inference that the discretion was exercised with an improper discriminatory motive. *See, e.g., Post v. Mohr, supra*, 2012 WL 76894, *9 (rejecting a claim of the denial of equal protection);

*Edge v. Ferrell, supra*, 2008 WL 942038, *7 (same). Accordingly, this claim does not rise to the level of a constitutional violation and should be dismissed.

Finally, to the extent that the plaintiff's allegations may be interpreted as seeking to invoke the supplemental jurisdiction of this court over potential state law claims, a district court may decline the exercise of supplemental jurisdiction if a plaintiff's state law claims raise novel or complex issues of state law, if the claims substantially predominate over the claims over which the district court has original jurisdiction, if the district court has dismissed all claims over which it had original jurisdiction, or for other compelling reasons. 28 U.S.C. § 1367. In the instant case, having considered the allegations of the plaintiff's Complaint and having recommended that the plaintiff's federal claims be dismissed, the Court further recommends that the exercise of supplemental jurisdiction be declined.

## RECOMMENDATION

It is recommended that the Court decline the exercise of supplemental jurisdiction in connection with the plaintiff's potential state law claims. It is further recommended that the plaintiff's Motion for Summary Judgment (R. Doc. 15) be denied and that the defendants' Motion for Summary Judgment (R. Doc. 11) be granted, dismissing as premature the plaintiff's claim that the defendants have violated his constitutional right to marry, and dismissing, with prejudice, the plaintiff's remaining claims, and that this action be dismissed.

Signed in Baton Rouge, Louisiana, on September 2, 2015.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　RICHARD L. BOURGEOIS, JR.
　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE